**In re AMAREX, INC., Debtor.**
**(Two Cases)**

**AMAREX, INC., et al., Plaintiffs,**

v.

**MARATHON OIL COMPANY, et al., Defendants.**

**AMAREX, INC., et al., Plaintiffs,**

v.

**AZTEC SPECIALTY LEASING CO., et al., Defendants.**

Bankruptcy No. BK–82–2335–A.
Adv. Nos. 84–564, 84–718.

United States Bankruptcy Court,
W.D. Oklahoma.

May 29, 1987.

---

See also, Bkrtcy., 53 B.R. 888.

Robin Phelan and Judith Elkin, of Haynes & Boone, Dallas, Tex., for debtor-plaintiff.

Warren D. Majors and Philip O. Watts of Spradling, Alpern, Friot & Gum, Oklahoma City, Okl., for Marathon Oil Co.

Ray G. Moss and Frank Polk of Daugherty, Bradford, Fowler & Moss, Oklahoma City, Okl., for Aztec Specialty Leasing Co.

## DECISION

RICHARD L. BOHANON, Chief Judge.

Various motions raise legal issues affecting these consolidated complaints seeking recovery of allegedly preferential transfers.

■ The first issue is the question whether a successor to the reorganized debtor may maintain the complaints and recover preferential transfers under 11 U.S.C.A. § 547 (1979 & Supp.1986).

In 1985 the Amarex plan of reorganization was confirmed. Pursuant to it Amarex was merged into Temex Energy, Inc. a wholly owned subsidiary of Templeton Energy, Inc. Under the plan Temex acquired all assets of Amarex and a subsequent order in aid of consummation provides "Temex is vested with the properties and rights of Amarex and survives as a wholly owned subsidiary of Templeton...." That order merely restates the corporate law effect of the merger.

The confirmed plan provides the holders of unsecured claims against Amarex receive common stock of Templeton in satisfaction of their claims. As a result the Amarex creditors received approximately 40% of Templeton's outstanding shares.

Prior to confirmation Amarex brought some 250 complaints seeking to recover about $30 million as preferential transfers. The defendants now contend the plaintiffs as successors by merger are not proper parties plaintiff and move to dismiss. They argue the right to recover a preferential transfer is personal to the debtor in possession or trustee and may not be maintained by a successor.

The issue turns on 11 U.S.C.A. § 1123 (1979) which provides:

"(b) A plan may ...

(3) provide for—

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest...."

Recently reported decisions dealing directly with the issue have taken different views. They are *Robison v. First Financial Capital Management Corp. (In re Sweetwater)*, 55 B.R. 724 (D. Utah 1985); *Tennessee Wheel & Rubber Co. v. Captron Corporate Air Fleet (In re Tennessee Wheel & Rubber Company)*, 64 B.R. 721 (Bankr.M.D.Tenn.1986) *aff'd mem., Tennessee Wheel & Rubber Co. v. American Express Travel Related Services Co.*, 75 B.R. 1 (M.D.Tenn.1987); *Xonics, Inc. v. E & F King & Co. (In re Xonics, Inc.)*, 63 B.R. 785 (Bankr.N.D.Ill.1986); *Duvoisin v. East Tennessee Equity, Ltd. (In re Southern Industrial Banking Corp.)*, 59 B.R. 638 (Bankr.E.D.Tenn.1986); and *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930 (Bankr. E.D.N.Y.1981).

As Judge Bare points out in *Southern Industrial*, § 1123(b)(3)(B) serves the useful function of allowing confirmation of a plan before possible claims against others have been fully investigated and pursued. To say confirmation must await a final decision of all possible preference complaints would either inordinately delay confirmation, with all the attendant expense, or result in a windfall in favor of those who received preferential transfers.

In a major case, such as this one, the time spent investigating, preparing, trying and appealing preference complaints could take many years. This case forms its own best example. The bankruptcy petition was filed in 1982, the complaints were brought in 1984 and the plan confirmed in 1985. The claimholders received reorganization values under the plan, and other distributions will be made soon. Depending on final resolution of other legal issues, these proceedings could possibly be tried in the winter of 1987–88, appeals to the district and circuit courts could realistically require 3 years. Thus, it is not beyond probability the judgments would not be final until 1991.

If reorganization were required to await such a lengthy period one of two results would likely obtain. Either the creditors would be required to wait an additional 5 or 6 years to receive a distribution, which would likely be substantially less, if any-

thing, due to continuing costs of administration, or the debtor in possession would choose to forego preference claims in order to seek plan confirmation. Both results would be intolerable. The first would result in mindless delay which Congress obviously sought to avoid and the second would condone windfalls to some creditors and a disproportionate distribution of the estate. Both these results are contrary to the very purpose of the Bankruptcy Code which strives to achieve the maximum distribution in the minimum time with all creditors of the same class sharing ratably. *Katchen v. Landy*, 382 U.S. 323, 328–29, 86 S.Ct. 467, 471–73, 15 L.Ed.2d 391 (1966); *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941).

Another basic principle of American law would also be violated if a successor is unable to maintain the claims. Almost 100 of the original 250 complaints have been settled. If the defendants thought delay would frustrate the reorganization goals they would, to say the least, not be encouraged to engage in settlements. Their incentive would be to delay the adversary proceeding in order to delay the bankruptcy case to the point a debtor in possession surrenders in order to get about the business of reorganization.

■ Plaintiffs make another argument which needs to be considered. The disclosure statement and plan clearly told the creditors these preference claims would pass to Temex upon confirmation. That plan binds Amarex, Temex, all creditors and "vests all of the property of the estate in the debtor." 11 U.S.C.A. § 1141 (1979 & Supp.1986). The claims thus vested in reorganized Amarex at the moment of confirmation and it then merged into Temex. If the creditors objected to this portion of the reorganization scheme the time for them to have raised the matter was at the confirmation hearing. Once that order was entered it had all the finality of a judgment and the parties are entitled to rely upon it as a *res judicata*. *See* 5 *Collier on Bankruptcy* ¶ 1141.01[1] (15th ed. 1985).

Preference claims are for the benefit of the creditors and had they wished them prosecuted in some other fashion the time to be heard was at confirmation. Defendants argue that since the creditors now own only 40% of Templeton, other parties benefit from a recovery contrary to the statement in § 550(a) that such recoveries be "for the benefit of the estate." 11 U.S.C.A. § 550(a) (1979 & Supp.1986). The answer is the final plan in any major case is the product of negotiation and values are exchanged in that process. If the creditors gave up some interest in the claims they received something in exchange, such as additional shares of Templeton stock. *See Unsecured Noteholders' Committee v. First National Bank and Trust Co. of Oklahoma City (In re Amarex, Inc.)*, 36 B.R. 59, 62 (Bankr.W.D.Okla.1984). Thus, the mere fact Templeton has other shareholders, unrelated to Amarex, does not mean the Amarex creditors are not receiving full value for any preference recovery. The estate was paid for the claims in the form of bargained for shares of Templeton stock. It ceased to exist upon confirmation and all its property, including these claims, passed to the debtor which merged into Temex.

Section 1123(b) is a permissive subsection, providing the plan could have designated a specific representative to prosecute the claims and distribute any recovery other than to Temex. That, however, is not to say the estate, viz, the creditors, may not seek to realize those values in the form of Templeton stock. The fact is Templeton paid a valuable consideration for the properties of the Amarex estate, including these claims. In return it received a binding confirmation order having all the finality of a judgment. To now seek to deprive it of what it bargained for and received would be an unconscionable deprivation of vested rights. If creditors or other interested parties wished to object to that result the time to be heard was at confirmation.

We thus conclude the Plaintiffs are proper parties to maintain the complaints.

The next issue we must consider is the impact of the 1984 Amendment to

§ 547(c)(2). The Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA), Pub.L. No. 98–353, 98 Stat. 333, eliminated the "45 day rule" of § 547(c)(2) and replaced it with "the ordinary course of business." That section previously stated a trustee could not avoid a transfer to the extent it was a "payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee ... made not later than 45 days after such debt was incurred" if "made in the ordinary course of business or financial affairs ... according to ordinary business terms." 11 U.S.C.A. § 547(c)(2) (1979). As amended the section precludes the trustee from avoiding a transfer of a "payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee ... made in the ordinary course of business or financial affairs ... according to ordinary business terms." 11 U.S.C.A. § 547(c)(2) (Supp. 1986).

The 1984 Amendments became effective October 8, 1984 pursuant to § 553(a) of the BAFJA. The Amarex, Inc. bankruptcy commenced December 2, 1982 and these adversary proceedings were all filed subsequent to October 8, 1984. Thus, the question becomes whether the 1984 Amendments are applicable to these consolidated proceedings.

■ Section 553(a) states "[e]xcept as otherwise provided in this section the Amendments made by this title shall become effective to *cases* filed 90 days after the date of enactment of this Act." (emphasis added). These defendants take the position the word "case" refers both to bankruptcy cases and adversary proceedings and consequently the 1984 Amendments apply.

Amarex contends these adversary proceedings arise in or are related to the bankruptcy case. Accordingly, the 1984 Amendments apply only to cases and their proceedings filed on or after October 8, 1984.

We have previously held Congress' reference to "cases" does not include adversary proceedings arising in or related to a case

under title 11. *Kenan v. Federal Deposit Insurance Corp. (In re George Rodman, Inc.),* 33 B.R. 348 (Bankr.W.D.Okla.1983); *accord Unsecured Noteholders' Committee v. First National Bank and Trust Co. of Oklahoma City (In re Amarex, Inc.),* 36 B.R. 59 (Bankr.W.D.Okla.1984).

In *George Rodman, Inc.* our analysis found Congress indeed recognized the distinction between cases and adversary proceedings as set forth in statutes concerning bankruptcy jurisdiction, abstention, venue, and jury trials as well as in the bankruptcy rules. 33 B.R. at 349. Accordingly, we hold the reference to "cases" in § 533(a) of the BAFJA refers only to bankruptcy cases. The 1984 Amendments are not applicable to these adversary proceedings.

■ Next we consider the delivery issue. This issue concerns when a transfer occurs for determining whether or not it falls within the preference period. The non-operator preference defendants contend a transfer occurs on the date of delivery of a check. Moreover, they allege delivery occurs on the date a check is placed in the mail.

The Court of Appeals for the Tenth Circuit addressed the delivery issue in *Bernstein v. RJL Leasing (In re White River Corp.)* 799 F.2d 631 (10th Cir.1986). The court stated "we hold that a transfer occurs upon delivery of the check."

The non-operator preference defendants request we take this analysis one step further and determine delivery occurs upon placing the check in the mail. *White River* quotes the following language: 'in the commercial world *receipt of a check,* as distinguished from the date it clears the drawee bank, is customarily looked upon as the date of payment of an obligation.' *Id.* at 634 (citing *Young Supply Co. v. McLouth Steel Corp.,* 55 B.R. 356, 357 (E.D.Mich. 1985)) (emphasis added). The Court's approval of this language leads us to believe receipt of a check, as opposed to placing it in the mail, is when delivery occurs.

Accordingly, we hold transfer occurs upon delivery of the check and delivery occurs upon receipt by the debtor.

The final issue concerns payments made by Amarex to operators of oil and gas wells during the preference period. Amarex was engaged in the business of acquiring and developing oil and gas interests. It entered into contractual arrangements with operators who would drill, complete and operate oil and gas wells in accordance with the contracts. These contracts are commonly referred to as joint operating agreements.

Amarex would make payments to these operators for its proportionate share of the costs of drilling also referred to as joint interest billings. It seeks to avoid these payments as preferences. Although these payments were made within the 90 day period, the consolidated operator defendants seek to insulate the transfers pursuant to § 547(c)(4), commonly referred to as the Subsequent Advance Rule.

Section 547(c)(4) states "[t]he trustee may not avoid under this section a transfer ... to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor ... not secured ... and on account of which new value the debtor did not make an otherwise unavoidable transfer...." 11 U.S.C.A. § 547(c)(4) (1979). "New value" is defined in § 547(a)(2) as "money or money's worth in goods, services, or new credit ... but does not include an obligation substituted for an existing obligation." 11 U.S.C.A. § 547(a)(2) (1979).

■ The Subsequent Advance Rule allows a creditor receiving a preference to setoff any subsequent unsecured credit extended to the debtor against the preference amount. The rule has three requirements. First, the creditor must extend new value after the preferential transfer occurs. Second, the new value extended must be unsecured. Third, the new value extended must go unpaid. *Remes v. Yeomans (In re Quality Plastics, Inc.)*, 41 B.R. 241, 242 (Bankr.W.D.Mich.1984).

The issue thus becomes a determination of when new value was extended to Amarex by the consolidated operator defendants. Amarex contends no new value was extended because it became obligated to the operator defendants upon execution of the joint operating agreement. This rationale has received disfavor in this circuit. *See White River*, 799 F.2d at 632. The operator defendants argue new credit should be deemed extended to Amarex on those dates the operators made payment to third party vendors on behalf of Amarex and other non-operators.

■ *White River* adopts the rationale of other circuits interpreting § 547(c)(2) in finding "a debt is incurred when a debtor first becomes legally bound to pay." *Id.* at 632; *see Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d 833 (5th Cir.1983). Accordingly, credit is extended when the debtor obtains service, merchandise or other asset from a creditor. When this analysis turns to third party transactions new credit extended must occur on the date the operator pays the third party vendor. This is logical for two reasons. First, it is the date the operator defendant parts with its resources on behalf of the non-operators. Second, the dates of payments to third party vendors are more easily verifiable through the defendant operator's records. Moreover, it becomes incumbent upon each defendant operator to produce those records as part of their defense under the Subsequent Advance Rule.

Accordingly, for purposes of § 547(c)(4) we hold new value was extended to Amarex on the dates the operator defendants made payment to third party vendors who supplied goods and rendered services.

In conclusion, we hold the plaintiffs as successors by merger are proper parties plaintiff; that the 1984 Amendments are not applicable to these proceedings; that transfer, pursuant to § 547, occurs when a check is delivered and, for these purposes, delivery occurs upon receipt; and that under the Subsequent Advance Rule concerning third party transactions, new credit is extended to the debtor on the date the creditor pays the third party vendor.